# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action Number |
| ) | 08-00224-02-CR-W-HFS |
| Javier Alejandro Rios-Carreon, ) | |
| ) | |
| Defendant. ) | |

## Report and Recommendation

Pending before the Court is the DEFENDANT RIOS-CARREON'S MOTION TO SUPPRESS filed March 5, 2009 (Doc. #99) by defendant Javier Alejandro Rios-Carreon ("Rios-Carreon"). On April 15, 2009, and May 5, 2009, the undersigned held an evidentiary hearing on Rios-Carreon's motion. Rios-Carreon was present and was represented by his counsel, John Lozano, Jr. The government was represented by Assistant United States Attorneys Kathleen Mahoney and Joseph Marquez. At the evidentiary hearing, the government called as witnesses four law enforcement officers: Agents Craig Markham and Karen Smilgis with the Federal Bureau of Investigation, Detective Timothy Smith and Sergeant Santiago Garza with the Kansas City, Missouri Police Department. Rios-Carreon testified on his own behalf. Additionally, seven exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Handwritten note with the address of "Mool" |
| Gov't. #2 | Advice of Rights form (in Spanish) |
| Gov't #3 | FBI report of interview |
| Gov't #4 | Drug Task Force Surveillance Log |
| Gov't #5 | Consent to Search form (in Spanish) |
| Gov't #6 | KCMO Police Dept. Investigative Report |
| Gov't # 7 | FBI report of retrieved telephone numbers |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT[1]

1.  In the summer of 2008, the Federal Bureau of Investigation ("FBI"), the Kansas City, Missouri Police Department ("KCPD"), and other law enforcement agencies were investigating a drug conspiracy operating out of northeast Kansas City.  Tr. at 4.

2.  As part of that investigation, law enforcement officers obtained authorization to perform wiretaps on different telephones, including two connected with one particular suspect, Dora San-Miguel.  Tr. at 4.

3.  In monitoring these telephone calls, law enforcement officers learned that Ms. San-Miguel referenced a man she called "Mall" or "Moll" who, at times, was supplier, co-broker, or customer of Ms. San-Miguel's illegal drug trade.  Tr. at 5.

4.  On June 22, 2008, law enforcement officers were conducting surveillance on Ms. San-Miguel when a blue Ford pickup with Missouri plates pulled up next to San-Miguel's vehicle.  Tr. at 6.

---

[1] In making these proposed factual findings, the Court is called upon to resolve conflicting testimony between Rios-Carreon and the law enforcement officer and, in so doing, the Court has to make credibility determinations.  In making such determinations, the Court concludes that the testimony of Rios-Carreon is largely not credible based upon  (1) the demeanor of Rios-Carreon on the stand; (2) the interest Rios-Carreon has in the outcome of the motion; (3) the opportunity of Rios-Carreon to hear, observe, and recall what was said or done; and (4) the conflicts (factual and logical) within Rios-Carreon's testimony. These proposed factual findings will include only the evidence and testimony that the Court found to be credible and relevant to the motion before the Court.

2

5. A Hispanic man then got out of the pickup and got into Ms. San-Miguel's vehicle who then drove back to her residence. Tr. at 6-7.

6. After meeting with some individuals at her residence, Ms. San-Miguel later dropped the Hispanic man off in the area near 20th Street and Monroe in Kansas City. Tr. at 6-7.

7. On July 28, 2008, law enforcement officers arrested Ms. San-Miguel. Tr. at 7.

8. As part of a search of Ms. San-Miguel's purse following the arrest, law enforcement officers recovered a piece of paper that had the name "Mool Sr" and the address "1918 Monroe" written on it. Tr. at 7; Gov't #1.

9. The next day, July 29, 2008, law enforcement officers went to conduct surveillance on 1918 Monroe and to learn the identity of persons residing at the address. Tr. at 8-9, 16-17.

10. On that date, Det. Tim Smith and Sgt. Santiago Garza with the KCPD went to 1918 Monroe. Tr. at 24-25, 37; Gov't #4.

11. Det. Smith was dressed in civilian clothes but was wearing a ballistic vest with the word "POLICE" on it. Tr. at 25.

12. Det. Smith arrived at the address with information that officers were looking to identify a Hispanic male driving a blue Ford pickup. Tr. at 25.

13. At approximately 2:44 p.m., Det. Smith saw a Hispanic male drive up to the address at 1918 Monroe in a blue Ford pickup. Tr. at 26.

14. The Hispanic male was Rios-Carreon. Tr. at 26-27.

15. Subsequently, Rios-Carreon left 1918 Monroe in the blue pickup and was followed by law enforcement officers. Tr. at 27.

16. At approximately 4:32 p.m., Rios-Carreon returned to 1918 Monroe in the blue pickup. Tr. at 27.

17. After Rios-Carreon exited the pickup, Det. Smith approached him, identified himself as a police officer, and told Rios-Carreon that he wanted to talk to him. Tr. at 28.

18. At that point, Rios-Carreon looked over his shoulder at Det. Smith and "then sped up and began to walk away from" Det. Smith. Tr. at 28.

19. Det. Smith then ordered Rios-Carreon to stop and again identified himself verbally as a police officer. Tr. at 28.

20. At this same time, other officers at the scene were yelling "police" in Spanish. Tr. at 7A-8A, 17A, 19A.[2]

21. Rios-Carreon heard the officers yelling "police" in Spanish. Tr. at 7A-8A, 17A, 19A.

22. Rios-Carreon continued walking away from Det. Smith and was observed reaching into either his pockets or the front of his pants. Tr. at 28, 33.

23. Det. Smith became worried that Rios-Carreon had a weapon. Tr. at 28-29.

24. At that point, Det. Smith drew his weapon and again ordered Rios-Carreon to stop and show his hands. Tr. at 28-29, 33.

25. Rios-Carreon was then seen reaching down toward the ground. Tr. at 29.

26. Rios-Carreon then straightened back up and continued to walk "hurriedly" away from Det. Smith. Tr. at 29, 32.

27. Rios-Carreon was then tackled from behind by another officer at the scene. Tr. at 30-32.

28. Rios-Carreon was then held prostrate on the ground and was hand-cuffed. Tr. at 31-32, 8A-9A.

29. After Rios-Carreon was detained, law enforcement officers located a clear plastic bag[3] on the ground where Rios-Carreon had reached toward the ground. Tr. at 30.

30. After Rios-Carreon was hand-cuffed, Sgt. Garza began communicating with him. Tr. at 39.

31. Sgt. Garza is fluent in Spanish. Tr. at 36.

---

[2] Transcript page references ending in "A" are from the Court's second day of hearing testimony on May 5, 2009.

[3] The powdery substance in the bag later field tested positively for cocaine. Tr. at 30.

4

32. Sgt. Garza was dressed in civilian clothes but had on a black tactical vest with police markings.  Tr. at 39-40.

33. After about 5 or 10 minutes, the handcuffs on Rios-Carreon were removed.  Tr. at 39.

34. Sgt. Garza gave Rios-Carreon a brief overview of the investigation and why the officers were talking to him.  Tr. at 41-42.

35. Sgt. Garza then asked Rios-Carreon if he would consent to a search of his house and pickup.  Tr. at 40, 42.

36. Rios-Carreon consented to the search of his house and vehicle signing a consent form (in Spanish) to that effect.  Tr. at 40-43; Gov't #5.

37. Thereafter, Rios-Carreon, who was still at the scene, never objected to the searches nor asked that the searches be stopped.  Tr. at 43, 22A-23A.

38. Law enforcement officers neither threatened nor coerced Rios-Carreon in order to obtain his consent.  Tr. at 43.

39. The searches ultimately led to the recovery of several items of contraband and incriminating evidence.  Tr. at Gov't #6; Gov't #7.

40. Agent Craig Markham of the FBI arrived at the scene shortly after Rios-Carreon had been arrested.  Tr. at 9-10, 44.

41. At the scene, Det. Garza and Agent Markham advised Rios-Carreon of his rights in Spanish.  Tr. at 10, 44; Gov't #2.

42. Rios-Carreon informed Det. Garza and Agent Markham that he understood his rights and was willing to speak to the officers without counsel.  Tr. at 10-12, 20-21, 44, 47; Gov't #2.

43. Thereafter, Rios-Carreon made a number of incriminating statements to law enforcement officers.  Tr. at 13-14; Gov't 3.

44. Law enforcement officers made no threats or promises to Rios-Carreon prior to his waiver of rights.  Tr. at 15.

45. Rios-Carreon appeared to the law enforcement officers to be of at least average intelligence and did not appear to be intoxicated or under the influence of any drugs.  Tr. at 15, 45.

5

**PROPOSED CONCLUSIONS OF LAW**

In his motion to suppress, Rios-Carreon argues that law enforcement officers (1) improperly seized him when he was restrained at his residence on July 29, 2008, (2) improperly searched his residence and vehicle, and (3) improperly obtained incriminating statements from him. As set out herein, the Court concludes that the stop and seizure of Rios -Carreon was proper, the ensuing arrest was constitutional, the searches of the residence and vehicle were consensual, and the incriminating statements made by Rios-Carreon were not the subject of threats or coercion and were voluntary.

With regard to the initial encounter between Rios-Carreon and law enforcement officers, the government argues that the initial seizure of Rios-Carreon was justified as a *Terry* stop. The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, however, the Constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

6

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id*. at 30, 88 S.Ct. at 1884-85. However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id*. at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional analysis; rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behaviors; jurors as fact-finders are permitted to do the same and so are law enforcement officers.

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). As such, in evaluating the validity of a *Terry* stop, "the totality of the circumstances – the whole picture" must be considered. *Id*. at 417, 101 S.Ct. at 695.

The government argues that law enforcement officers were justified in stopping Rios-Carreon because the officers had a reasonable suspicion that criminal activity was afoot with Rios-Carreon. The government points to the apparent "suspicious" meeting between Rios-Carreon and Ms. San-Miguel, the telephone references to "Mool" captured by the wiretap on Ms. San-Miguel's telephones, and Ms. San-Miguel's later statement that "Mool" resided at 1918 Monroe. The government may be correct that these facts would amount to reasonable suspicion. However, based on the evidence before the Court, there is no basis for concluding that the officers approaching and detaining Rios-Carreon were aware of these facts. Perhaps they were, but the only testimony submitted to the Court did not convey this information.

Det. Smith was the only law enforcement officer involved in the initial confrontation with Rios-Carreon who testified at the evidentiary hearing. He testified that on July 29, 2008, he was "asked to assist in a surveillance at 1918 Monroe Avenue." Tr. 24-25. With regard to the information he had regarding Rios-Carreon, on July 29, 2008, Det. Smith testified:

> Q: Now, did you have information about a man that you were asked to contact at that address?
>
> A: Yes, ma'am.
>
> Q: And what information did you have?
>
> A: Well, had information that person was driving – would be an Hispanic male and would be driving a blue Ford F150 and would possibly be responding back to the address of 1918 Monroe.

Tr. at 25.

8

Based on Det. Smith's testimony, the Court cannot include the evidence of Rios-Carreon's possible interactions with Ms. San-Miguel prior to July 29, 2008, as part of the totality of circumstances known to Det. Smith that might amount to reasonable suspicion.[4] Moreover, the Court does not find that Rios-Carreon's conduct on July 29, 2008, <u>prior</u> to his return to 1918 Monroe would lead a reasonable officer to conclude that criminal activity was afoot. According to Det. Smith, Rios-Carreon was observed leaving his house, getting in his Ford pickup, driving away, and then returning to his residence approximately two hours later. This evidence – whether considered by itself or in connection with Rios-Carreon's subsequent conduct – is simply too innocuous to be of value in ascertaining the propriety of any *Terry* stop of Rios-Carreon on July 29, 2008.

---

[4] It is important to note that there is no evidence in the record before the Court that Det. Smith was dispatched to 1918 Monroe with instructions to apprehend or arrest Rios-Carreon. Certainly a law enforcement officer who has observed and learned facts that amount to reasonable suspicion may instruct another officer (who may be physically closer to a suspect) to stop a suspect. *See*, *e.g.*, *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) (a police officer's suspicion that a defendant was armed was reasonable where the officer had received a radio call from the F.B.I. asking him to find and stop a blue Chevy with a certain license number for suspected drug activity). Similarly, it is well-established that a law enforcement officer has valid reasonable suspicion to stop a suspect based on a wanted poster, flyer, or bulletin even if the officer does not have knowledge of the facts supporting the wanted poster, flyer, or bulletin. *United States v. Hensley*, 469 U.S. 221, 232, 105 S.Ct. 675, 682 (1985). The Court finds these scenarios distinguishable from the present case. Likewise, the Court finds the Eight Circuit cases dealing with investigative teams inapposite. The Eighth Circuit has found:

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory to impute the knowledge of one officer to others. We impute information <u>if there has been "some degree of communication" between the officers</u>. This requirement distinguishes officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject.

*United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005) (*emphasis added*) (*citations omitted*). In this case, the record is devoid of evidence of any communication of "reasonable suspicion" information to Det. Smith.

9

Notwithstanding the foregoing, however, the Court nonetheless concludes that the stop, seizure, and arrest of Rios-Carreon did not violate the Constitution. It is well-settled that:

> Not all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

*United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001).[5] *See also Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991) (Fourth Amendment jurisprudence makes "it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions"). The Court concludes that Det. Smith's actions in approaching Rios-Carreon and stating that he wanted to talk to him did not implicate Constitutional concerns.

---

[5] The determination of when an encounter between law enforcement and a citizen rises to the level of non-consensual (and thus triggers the Fourth Amendment) is "a fact intensive one which turns upon the unique facts of each case." *Jones*, 269 F.3d at 925. Nonetheless, several matters have been considered by the courts and as summarized recently by the Eighth Circuit:

> A request to see identification is not a seizure, as long as the police do not convey a message that compliance with their request[ ] is required.. There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse. That many people agree to speak with police when asked does not tend to suggest that reasonable persons do not feel free to decline: While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.

*United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (*citations and internal quotations omitted*).

10

When Rios-Carreon was tackled to the ground by officers on July 29, 2008, a Fourth Amendment seizure occurred requiring some justification. *See*, *e.g.*, *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988) (an initially consensual encounter between a law enforcement officer and a citizen "can ripen into a seizure requiring reasonable suspicion"). In that regard, a mere refusal to answer an officer's questions, standing alone, does not warrant a seizure. However, Rios-Carreon's conduct when Det. Smith approached went well beyond a refusal to answer any questions. According to Det. Smith's testimony, between his initial approach to Rios-Carreon and the tackling by another officer, Rios-Carreon looked over his shoulder at Det. Smith and "then sped up and began to walk away from" Det. Smith. Det. Smith then ordered Rios-Carreon to stop, however, Rios-Carreon continued walking away from Det. Smith and was observed reaching into either his pockets or the front of his pants. Det. Smith became worried that Rios-Carreon had a weapon. Consequently, Det. Smith drew his weapon and again ordered Rios-Carreon to stop and show his hands. Rios-Carreon was then seen reaching down toward the ground, then straightening back up, and continuing to walk "hurriedly" away from Det. Smith.

The actions of Rios-Carreon reasonably and justifiably triggered concerns for officer safety. Those actions changed the dynamic of the encounter. As the Eighth Circuit has explained, "an individual's actions during a consensual encounter may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety." *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000). To that end, an individual's "nervousness" and "furtiveness" may support a finding of reasonable suspicion. *See*, *e.g.*, *United States v. Atlas*, 94 F.3d 447, 451 (8th Cir. 1996) ("[m]ost significant[ ]" in

11

establishing reasonable suspicion were the facts that the suspect's eyes grew wide when he saw the officer, he threw down a bag he was holding, he began to walk away, and he exhibited nervousness in responding to the officer's questions). In this case, Rios-Carreon's refusal to show Det. Smith's his hands and his act of reaching into his pants add to the totality of the circumstances confronting the officers at 1918 Monroe on July 29, 2008. With the actions witnessed by the officers, they were justified in temporarily seizing Rios-Carreon for purposes of officer safety. Thereafter, once the plastic bag with the white substance was located on the ground where Rios-Carreon had been seen reaching down, the officers were justified in placing Rios-Carreon under arrest based on probable cause that he had committed a crime. The Court finds no impropriety in the seizure of Rios-Carreon.

With regard to the ensuing search of Rios-Carreon's residence and vehicle, while law enforcement officers conducted such searches without the benefit of a warrant, it is established law that an exception to the warrant requirement of the Fourth Amendment is consent to search. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801 (1991). When, as in this case, searches conducted pursuant to alleged consent are subsequently challenged by a defendant, the touchstone in analyzing a motion to suppress is whether the consent was voluntary.

In broad strokes, consent to search is voluntary if it is "the product of an essentially free and unconstrained choice by its maker . . . rather than a product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48 (1973). To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

12

> (1) the defendant's age; (2) the defendant's general intelligence
> and education; (3) whether the defendant was under the influence
> of drugs or alcohol; (4) whether the defendant was informed of his
> *Miranda* rights prior to consent; and (5) whether the defendant had
> experienced prior arrests so that he was aware of the protections
> the legal system affords to suspected criminals.

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001). With regard to the environment surrounding a consent, courts will examine whether the person who consented:

> (1) was detained and questioned for a long or short time; (2) was
> threatened, physically intimidated, or punished by the police; (3)
> relied upon promises or misrepresentations made by the police; (4)
> was in custody or under arrest when the consent was given; (5)
> was in a public or secluded place; or (6) either objected to the
> search or stood by silently while the search occurred.

*United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

In this case, and after making credibility findings of the testimony given at the evidentiary hearing, the Court concludes that Rios-Carreon voluntarily and knowingly consented to the searches of his vehicle and residence. The consent forms were in Spanish, were explained to Rios-Carreon in Spanish, and were signed by Rios-Carreon. As demonstrated on the witness stand, Rios-Carreon has the general intelligence to understand the meaning and consequences of consenting to a search. Rios-Carreon did not appear to be (and does not claim to have been) impaired by alcohol or drugs at the time. Rios-Carreon was not threatened by officers nor was he given promises by officers. Finally, Rios-Carreon was present at the scene when the searches occurred and stood by silently without objection or stated concern. The Court finds no impropriety in the searches of Rios-Carreon's vehicle and residence.

13

Finally, Rios-Carreon objects to the government's use of incriminating statements he made to officers after his arrest. The Fifth Amendment of the U.S. Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying voluntarily in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*U.S. v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467

U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

Consequently, despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1628. However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997) (*citing United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir.1995)); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of the entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background,

15

experience, and conduct of the accused. The government has the
burden of proving that the defendant voluntarily and knowingly
waived his rights.

*Id*. at 977 (*internal citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has explained:

First, the relinquishment of the right must have been voluntary in
the sense that it was the product of a free and deliberate choice
rather than intimidation, coercion, or deception. Second, the
waiver must have been made with a full awareness of both the
nature of the right being abandoned and the consequences of the
decision to abandon it. Only if the "totality of the circumstances
surrounding the interrogation" reveal both an uncoerced choice
and the requisite level of comprehension may a court properly
conclude that the *Miranda* rights have been waived.

*Id*. at 421, 106 S.Ct. at 1141. These principles subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212 F.3d 413 (8th Cir.2000), the Eighth Circuit found:

A waiver is voluntary if it is the product of a free and deliberate
choice rather than intimidation, coercion, or deception. A waiver is
knowing and intelligent if it has been made with a full awareness
of both the nature of the right being abandoned and the
consequences of the decision to abandon it.

*Id*. at 420.

In reviewing the totality of the circumstances surrounding the statements made by Rios-Carreon to law enforcement officers following his arrest on July 29, 2008, the Court concludes that the statements were made voluntarily and the statements were made after a voluntary, knowing and intelligent waiver of Rios-Carreon's *Miranda* rights. Finally, in light of the Court's findings, the Court rejects Rios-Carreon's arguments regarding "fruit of the poisonous tree."

16

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** DEFENDANT RIOS-CARREON'S MOTION TO SUPPRESS filed March 5, 2009 (Doc. #99).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

<pre>              /s/ John T. Maughmer              </pre>
**John T. Maughmer
United States Magistrate Judge**